Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| E.W., as next of friend to minor plaintiff Z.W., | CIVIL ACTION NO. |
| Plaintiff, | COMPLAINT FOR PERSONAL INJURIES |
| v. | |
| YOUTUBE, LLC; GOOGLE LLC; ALPHABET INC.; SNAP, INC.; TIKTOK INC.; BYTEDANCE INC., | |
| Defendants. | JURY TRIAL DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. … Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiff E.W., on behalf of himself and as next of friend to his minor child, Z.W., brings this action against YouTube, LLC, Google LLC, and Alphabet Inc. (collectively, "YouTube"), Snap, Inc., doing business as Snapchat ("Snapchat"), and TikTok, Inc. and

ByteDance, Inc. (collectively, "TikTok") and alleges as follows:

## I.   INTRODUCTION

1.   This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically personal injuries caused to Plaintiff E.W. and his minor child Z.W. caused by Z.W.'s dependency on and addictive use of an exposure to Defendants' unreasonably dangerous social media products, YouTube, Snapchat, and TikTok.

2.   On December 7, 2021, the United States Surgeon General issued an advisory cataloging extensive evidence showing a dramatic increase in teen mental health crises including suicides, attempted suicides, and inpatient mental-health admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent. Incidence of serious depression and dissatisfaction with life in this age group have likewise increased dramatically.

3.   The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, including and for purposes of this lawsuit,

    a.   The YouTube product which launched in 2005 and was acquired by Google in 2006, and which is designed and distributed by Google.

    b.   The Snapchat product which launched in 2011, and which is designed and distributed by Snap, Inc.

    c.   The TikTok product which launched in 2016, and which is designed and distributed by TikTok.

4.   By 2014, 80 percent of high-school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly." Many children and teenagers spend hours throughout the day and night using Defendants YouTube, Snapchat, and TikTok products.

5.   Peer reviewed studies and the available medical science have identified a

particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among teenagers. YouTube, Snap, and TikTok have spent years publicly denying these findings—while internally confirming them. YouTube, Snap, and TikTok, in fact, know that their products *are* harmful and addictive, which the social media industry has been aware of for years. YouTube, Snap, and TikTok knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

6.      Defendants have invested billions of dollars to intentionally design their products to be addictive and encourage use that they know to be problematic and highly detrimental to their users' mental health. For example, internal, non-public data collected by Instagram and Snapchat reveal large numbers of its users—particularly teenage girls—are engaging in problematic use of its products. Indeed, the problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all of the hallmarks of clinical addiction.

7.      In short, Defendants' social media products create a perfect storm of addiction, social comparison, and exposure to incredibly harmful content and harmful product features. Defendants program and operate their products in a manner that prioritizes engagement and profits over user safety, and then refuse to make safety-related changes that would protect U.S. children and teens from most of the harms their products cause. Defendants design and distribute inherently dangerous products that appeal to kids and operate their technologies in a manner that promotes and amplifies harmful content, for their own financial benefit.

8.      Defendants also advertise their products in misleading ways, assuring parents

COMPLAINT

and the public that their products are safe and fun and that they utilize their technologies to ensure a safe and age-appropriate experience. Nothing could be further from the truth.

9.      Defendants also know or should know that their products cause devastating harm. In late 2021, a Facebook whistleblower disclosed thousands of internal Meta Platform, Inc. ("Meta") documents to the United States Securities Exchange Commission (the "SEC") and Congress. Meta owns and operates social media products, is a direct competitor to these defendants, and, most importantly, operates the same fundamental types of technologies and products as these defendants, for example direct messaging, recommendation features, content promoting algorithms, social comparison features, content identifying technologies, and addictive design mechanisms – to name only some. Meta's records are relevant for the purpose of showing what these Defendants knew or should have known about their products.

10.     The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation, and even suicide and self-injury.

11.     The Facebook papers confirm what these social media industry Defendants – as a group – have actively concealed for years, which is that they are making calculated cost-benefit business decisions and consistently prioritizing their already astronomical profits over human life. Defendants' products contain several features having nothing to do with user control or access to information, features that by themselves and because of their design cause harm. The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

12.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers, much less for minor users.  It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

13. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive quality of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users and their parents.

14. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. In other words, Defendants intentionally created an attractive nuisance to young children, but failed to provide adequate safeguards from the harmful effects they knew were occurring because of their products.

## II.    PARTIES

15. Plaintiff E.W. is an individual residing in Michigan, and is the father of his 15-year-old son, Z.W. Plaintiff brings this suit on behalf of Z.W.

16. Plaintiff E.W. has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with Z.W.'s use of their social media products.  As such, in prosecuting this action, Plaintiff is not bound by any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements

17. Defendant YouTube, LLC is a limited liability company organized under the laws of the State of Delaware with an address at 75 9th Avenue, New York, New York 10011. Since 2006, Defendant Google has operated YouTube as a wholly-owned subsidiary of Defendant Google. At all relevant times, Defendant Google has operated Defendant YouTube.

18. Defendant Google is a limited liability company organized under the laws of the State of Delaware with an address at 111 8th Avenue, New York, New York 10011. Defendant Google is a wholly-owned subsidiary of Defendant Alphabet Inc., which at all

relevant times has controlled Defendant Google.

19.     Defendant Alphabet, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Defendant Alphabet is the sole owner of Defendant Google and controls Defendant Google. Defendant Alphabet is the alter ego of Defendant of Google. Defendant Google is the alter ego of Defendant YouTube. Defendants YouTube and Google direct all profit to, and report revenue through, Defendant Alphabet.

20.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States and in Illinois.

21.     Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in Illinois.

22.     Defendant ByteDance, Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns and/or operates TikTok, Inc., and owns and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in Illinois.

### III.     JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents of different states.

24.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Google and ByteDance's principal places of business are in the Northern District of California (in

Mountain View, California) and Defendants Snap, Inc. and TikTok Inc are residents of the State of California.

## IV.    DIVISIONAL ASSIGNMENT

25.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Santa Clara County, where Defendants Google and ByteDance Inc. maintains its primary place of business.

## V.    FACTUAL ALLEGATIONS

**A.    YouTube Background**

26.    YouTube is an American online video sharing and social media platform headquartered in San Bruno, California.  It was launched on February 14, 2005, by Steve Chen, Chad Hurley, and Jawed Karim, and was purchased by Google in October 2006 for $1.65 billion.

27.    YouTube is the second most visited website, after Google Search, and has more than 2.5 billion monthly users who collectively watch more than one billion hours of videos on YouTube each day.

28.    Google earns the bulk of its YouTube revenue through advertisements. Its product design allows Google to embed targeted advertising directly into the video clips that its users watch, as well as promote featured content.[1]

29.    The YouTube product partners with channel owners who, upon crossing a viewership threshold, can elect to monetize the channel to deliver advertisements to viewers. YouTube then takes a 45% cut of the advertising revenue and passes the rest to the channel.[2]

30.    Moreover, advertising on YouTube's channels can either be contextual (informed by the particular channel or video) or behavioral (informed by the behavior of the device owner as tracked across different websites, apps, and devices).  YouTube has long

---

[1]  Andrew Beattie, *How YouTube Makes Money Off Videos*, Investopedia, Oct. 31, 2021, https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp

[2] *See In the Matter of Google LLC and YouTube, LLC*, (F.T.C. Sept. 4, 2019), at 2 (citation omitted).

allowed channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, but vanishingly few content creators would elect to do so, in no small part because they receive warnings that disabling behavioral advertising can "significantly reduce your channel's revenue." In short, both YouTube and the channels have a strong financial incentive to use behavioral advertising. *Id.* at 2-3.

31.     In the first nine months of 2021, YouTube generated $20.21 billion in revenue from advertising. In fiscal year 2021, it generated total advertising revenue of $28.8 billion.[3]

32.     YouTube has developed proprietary algorithms and uses those to recommend content to users based on secret formulas Google refuses to disclose. In a 2021 post on YouTube's official blog, Cristos Goodrow, VP of Engineering at YouTube, described the algorithm in general terms as follows,

> To provide such custom curation, our recommendation system doesn't operate off of a 'recipe book' of what to do. It's constantly evolving, learning every day from over 80 billion pieces of information we call signals. That's why providing more transparency isn't as simple as listing a formula for recommendations, but involves understanding all the data that feeds into our system. A number of signals build on each other to help inform our system about what you find satisfying: clicks, watch time, survey responses, sharing, likes, and dislikes.

Cristos Goodrow, *On YouTube's recommendation system*, Inside YouTube, Sept. 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

33.     At the same time, YouTube has actual knowledge that its algorithms are promoting and amplifying violent and harmful content. According to YouTube and Google insiders, YouTube employees have notified leadership of these defects in the YouTube algorithm and, each time such notice of provided, they are told by YouTube leadership "Don't rock the boat." Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg, Apr. 2, 2019, *available at* https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant. In other words, YouTube is prioritizing

---

[3] Alex Weprin, *YouTube Ad Revenue Tops $8.6B, Beating Netflix in the Quarter*, The Hollywood Reporter, Feb. 1, 2022, *available at* https://www.hollywoodreporter.com/business/digital/youtube-ad-revenue-tops-8-6b-beating-netflix-in-the-quarter-1235085391/.

engagement over user safety, despite actual knowledge of the harms its product is causing.

34.     According to YouTube insiders, "The company spent years chasing one business goal above others: 'Engagement,' a measure of the views, time spent and interactions with online videos.  Conversations with over twenty people who work at, or recently left, YouTube reveal a corporate leadership unable or unwilling to act on these internal alarms for fear of throttling engagement." *Id*.

35.     In 2012, YouTube concluded that the more people watched, the more ads it could run—and that recommending videos, alongside a clip or after one was finished, was the best way to keep eyes on the site.  So YouTube, then run by Google veteran Salar Kamangar, set a company-wide objective to reach one billion hours of viewing a day, and rewrote its recommendation engine to maximize for that goal. *Id*.

36.     YouTube doesn't give an exact recipe for virality. But in its race to one billion hours, a formula emerged: Outrage equals attention. That is, YouTube re-designed its product to maximize addiction and stayed the course on programming its algorithm to prioritize engagement over user safety, despite its knowledge that such programming was harming a significant number of its users – including children and teens.

37.     Nor is YouTube's algorithm-drive content promotion feature a small part of its product. On the contrary, "YouTube has described its recommendation system as artificial intelligence that is constantly learning which suggestions will keep users watching.  These recommendations, it says, drive 70 percent of views, but the company does not reveal details of how the system makes its choices." Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles*, N.Y. Times, June 3, 2019, *available at* https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

38.     YouTube's automated recommendation system drives most of the platform's views by telling users, like Z.W. what they should watch next. It makes recommendations to minor users and exposes them to content they otherwise would not see.

39.     YouTube's recommendation technologies determine the content that gets directed and/or populates its user experience on the YouTube social media product. This

includes content sent directly from YouTube to its users, for YouTube's own purposes, and outside of any specific user search or request for such content. YouTube knows that its algorithms are promoting and amplifying harmful content to children and teens like Z.W. Google invented its recommendation system technologies and has patented various aspects of its social media products. *See*, https://patents.google.com/patent/US20100268661A1/en.







**Fig 1**

*See also, e.g.,* https://patents.google.com/patent/US20090112989A1/en,

### Trust-based recommendation systems

#### Abstract

Systems and methods that analyze aggregated item evaluation behavior of users, to suggest a recommendation for the item. An analysis component forms a collective opinion by taking as input votes of users and trusted relationships established therebetween, to output an evaluation and/or recommendation for the item. Accordingly, within a linked structure of nodes, personalized recommendations to users (e.g., agents) are supplied about an item(s) based upon the opinions/reviews of other users, and in conjunction with the declared trust between the users.

#### Classifications

🔵 G06Q30/02  Marketing, e.g. market research and analysis, surveying, promotions, advertising, buyer profiling, customer management or rewards; Price estimation or determination



These are "computer implemented systems" comprised of "computer executable components." *Id*. And these are only two examples. Defendants have a multitude of patents relating to their social media products and product features.

40.     YouTube knows that underage users are on its YouTube platform and has deliberately designed its product in a manner intended to evade parental authority and consent.

41.     The YouTube product is used by many millions of children every day, children who have become addicted to the product a result of its design and product features, like Z.W., to the point where parents cannot remove all access to the YouTube product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

A.     **Snapchat Background**

42.     Snapchat was founded in 2011, by three Stanford college students, and was originally called *Pictaboo*.  It started as a simple app with the idea that it would be nice to be able to send photos to friend that would disappear. Months after its launch, *Pictaboo* had only amassed 127 users,[4] however, so it changed its name to Snapchat and began marketing to and targeting high school students. Within a year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

43.     The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among minors.

44.     In 2012, Snap added video capabilities to its Snapchat product, pushing the

---

[4] *See* https://frozenfire.com/history-of-snapchat/

number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, text conversations, "Our Story," Geofilters, and Snapcash; in 2015, Discovery, QR code incorporation, and facial recognition software; in 2016, Memories and Snapchat Groups.

45.    By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

46.    By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

47.    Snap also took care to patent its social media inventions along the way. To name only some examples (*see* https://patents.justia.com/assignee/snapchat-inc),

**Prioritization of messages within gallery**
**Patent number:** 9430783
**Abstract:** In some embodiments, a computer implemented method of processing messages may include creating a gallery using messages received from user devices; scanning the messages to identify a selected message of messages; receiving, from an owner of the brand, a prioritization of the selected message; prioritizing, in response to the prioritization, the selected message in the gallery; and supplying the gallery to a user device for display to a user of the user device.
**Type:** Grant
**Filed:** July 24, 2015
**Date of Patent:** August 30, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Michael Sehn

13

COMPLAINT

**Content delivery network for ephemeral objects**
**Patent number:** 9407712
**Abstract:** A computer implemented method includes receiving an object scheduled for automatic deletion after a specified viewing period, a specified number of views or a specified period of time. Object push criteria are evaluated. The object is pushed to an edge server cache in response to evaluating. The object is served in response to a request for the object.
**Type:** Grant
**Filed:** December 21, 2015
**Date of Patent:** August 2, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Sehn

**Apparatus and method for supplying content aware photo filters**
**Patent number:** 9407816
**Abstract:** A server includes a photo filter module with instructions executed by a processor to identify when a client device captures a photograph. Photograph filters are selected based upon attributes of the client device and attributes of the photograph. The photograph filters are supplied to the client device.
**Type:** Grant
**Filed:** December 21, 2015
**Date of Patent:** August 2, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Sehn

**Gallery of messages from individuals with a shared interest**
**Patent number:** 9385983
**Abstract:** A machine includes a processor and a memory connected to the processor. The memory stores instructions executed by the processor to receive a message and a message parameter indicative of a characteristic of the message, where the message includes a photograph or a video. A determination is made that the message parameter corresponds to a selected gallery, where the selected gallery includes a sequence of photographs or videos. The message is posted to the selected gallery in response to the determination. The selected gallery is supplied in response to a request.
**Type:** Grant
**Filed:** December 19, 2014
**Date of Patent:** July 5, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Sehn

### Integrated exchange of development tool console data

**Patent number:** 9354868

**Abstract:** Embodiments of the present invention provide a method, system and computer program product for exchanging console data in a messaging system. In an embodiment of the invention, a method for exchanging console data in a messaging system includes receiving a message in a messaging client executing in memory by at least one processor of a computer. The method further includes selecting in the message in the messaging client a portion of console data for a version of source code. For instance, the console data can be a selection of source code or an error message for a selection of source code. Finally, in response to the selection of the portion of console data, corresponding meta-data for the message can be extracted and a version of source code for the console data can be determined from the meta-data. Finally, the version of the source code can be loaded in an IDE executing in the memory by the at least one processor of the computer.

**Type:** Grant

**Filed:** December 2, 2013

**Date of Patent:** May 31, 2016

**Assignee:** Snapchat, Inc.

**Inventors:** Lisa Seacat Deluca, Bianca X. Jiang, Asima Silva

### Content delivery network for ephemeral objects

**Patent number:** 9237202

**Abstract:** A computer implemented method includes receiving an object scheduled for automatic deletion after a specified viewing period, a specified number of views or a specified period of time. Object push criteria are evaluated. The object is pushed to an edge server cache in response to evaluating. The object is served in response to a request for the object.

**Type:** Grant

**Filed:** October 8, 2014

**Date of Patent:** January 12, 2016

**Assignee:** Snapchat, Inc.

**Inventor:** Timothy Sehn

### Method and system for integrating real time communication features in applications

**Patent number:** 9083770

**Abstract:** A computer has a processor and a memory connected to the processor. The memory stores instructions executed by the processor to receive a real time communication request from a client device and perform an evaluation of the number of client devices associated with the real time communication request. The evaluation results in the coordination of peer-to-peer communications in the event of two client devices and an attempt to host a real time communication session using a first protocol in the event of three or more client devices. A second protocol for the real time communication session is invoked in the event that the attempt to host the real time communication session using the first protocol is unsuccessful.

**Type:** Grant

**Filed:** November 7, 2014

**Date of Patent:** July 14, 2015

**Assignee:** Snapchat, Inc.

**Inventors:** Michael Dröse, Tadeusz Kozak, Kavan Antony Seggie, Dmitry Sobinov

15

COMPLAINT

**Apparatus and method for supplying content aware photo filters**

**Patent number:** 9225897

**Abstract:** A server includes a photo filter module with instructions executed by a processor to identify when a client device captures a photograph. Photograph filters are selected based upon attributes of the client device and attributes of the photograph. The photograph filters are supplied to the client device.

**Type:** Grant

**Filed:** July 7, 2014

**Date of Patent:** December 29, 2015

**Assignee:** Snapchat, Inc.

**Inventor:** Timothy Sehn

**User interface for accessing media at a geographic location**

**Patent number:** 9143681

**Abstract:** A system and method for accessing a media item on a mobile device are described. The mobile device includes a media placement application and a media display application. The media placement application receives a selection of a media item generated by the mobile device. The media placement application generates access conditions for the media item based on geolocation and position information of the mobile device associated with the selected media item. The media display application monitors the geolocation and position of the mobile device and determines whether the geolocation and position of the mobile device meet the access conditions of the selected media item. The media display application generates a notification that the selected media item is available to view in a display of the mobile device in response to determining that the geolocation and position of the mobile device meet the access conditions of the selected media item.

**Type:** Grant

**Filed:** April 9, 2015

**Date of Patent:** September 22, 2015

**Assignee:** Snapchat, Inc.

**Inventors:** Rylee Ebsen, Nathan Jurgenson, Ryan Marzolph, Evan Spiegel

**Apparatus and method for accelerated display of ephemeral messages**

**Patent number:** 8914752

**Abstract:** An electronic device comprises a display and an ephemeral message controller to present on the display an ephemeral message for a transitory period of time. A touch controller identifies haptic contact on the display during the transitory period of time. The ephemeral message controller terminates the ephemeral message in response to the haptic contact.

**Type:** Grant

**Filed:** August 22, 2013

**Date of Patent:** December 16, 2014

**Assignee:** Snapchat, Inc.

**Inventor:** Evan Spiegel

16

COMPLAINT

**Apparatus and method for single action control of social network profile access**
**Patent number:** 8775972
**Abstract:** A computer implemented method includes allowing a user to access a user-controlled social network profile page with posts in a specified order. A user is permitted to traverse an interface element across the specified order to establish a set position for the interface element. Access to posts is provided on a first side of the set position to define a viewable profile. Access to posts is blocked on a second side of the set position to define a non-viewable profile.
**Type:** Grant
**Filed:** November 8, 2012
**Date of Patent:** July 8, 2014
**Assignee:** SnapChat, Inc.
**Inventor:** Evan Thomas Spiegel

48.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snapchat is now one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[5] Snap estimates having between 92.8 and 96.6 million users in the U.S., at least 17 to 17.7 million of which are under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

49.     The Snapchat product incorporates several product features that serve no purpose other than to create dependencies on Snap's social media product, which dependencies in turn cause sleep deprivation, anxiety, depression, shame, interpersonal conflicts, and other serious mental and physical harms.

50.     These include hidden rewards, such as trophies or charms, streaks, and scores (signals of social recognition like the "likes" metrics available in other platforms), which features serve no practical purpose other than to addict and incentivize users to engage in as much Snap-related behavior as possible.[6] These hidden reward features operate essentially like a self-esteem slot machine for teens, incentivizing kids to utilize the application as often and in as many ways as possible – including, and frequently, in excessive and dangerous

---

[5] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/
[6] *See https://learn.g2.com/snapchat-trophies; see also* https://www.online-tech-tips.com/smartphones/snapchat-trophies-are-gone-but-this-snapchat-charm-list-will-help/ ("Snapchat is one of the most addictive social media platforms. It's so popular among users for two reasons. One is the Snapchat's visual add-ons like filters and text that you can apply when you send a message. The second reason is the app's reward system that gives you awards the more you send those messages to other users.")

17
COMPLAINT

ways – in order to unlock rewards. Snap knows that these features serve no practice purpose (no purpose at all other than increased engagement) and that they are addictive, particularly to teen users, in a manner that is harmful to those users' health and well-being. Nonetheless, Snap has stayed the course.

51.    Prior to 2020, Snap created and distributed a hidden reward system that allowed users to unlock certain badges once they achieved something within the app – called Trophies. Snapchat had more than 50 different "locked" emojis the represented trophies and users and users would only find out what unlocked each emoji once it was unlocked. Some examples of what could earn a trophy include things like sending a Snap between 4 and 5 am, getting your Snap posted on a local story, sending 500 video Snaps, and hitting a Snapchat score of 500,000. There were others, unknown to users.

52.    Currently, Snap creates and distributes a similar hidden reward system that allowed users to unlock certain badges once they achieve something within the app – called Charms. It is unknown how many charms are possible but, like with Snap's trophies, these charms promise hidden rewards and users, specifically Z.W., engage in excessive use of Snapchat in the hope of unlocking them. Z.W. earned a "best friend" charm, for example, after talking to a specific Snapchat user for a few days consecutively.

53.    Snap's Streaks product is widely considered to be one of the most addictive "especially to teenagers."[7]  *See also* FBD 37/21, "Teen Meaningful Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive."). Users can gain streaks on Snapchat by exchanging snaps for several consecutive days. They must send and receive at least one snap from the same user within a 24-hour period, otherwise the streak will be lost, thereby making sure that people return every day. Z.W. one obtained a Snap Streak of thirty-two days, which means that he exchanged Snaps with a specific Snapchat once or more every day for thirty-two days and without exception. The Snap

---

[7]*See* https://beanfee.com/articles/why-are-snapchat-streaks-so-addictive/; *see also, e.g.* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296.

COMPLAINT

Streaks product serves a singular purpose – which is addiction. Not just addiction, but addiction by teens. Many adult users do not know that these features exist.

54.     Like Snap trophies and streaks, the Snap Score feature also keeps users addicted, trying new things, and coming back for more. No one knows precisely how a Snap Score is determined, though Snap has said that it uses a "special equation" that incorporates all the ways someone might use Snapchat and other undisclosed criteria. Z.W. believes his Snap Score is somewhere in the 10,000's but does not know precisely how that was calculated, just that he wants a higher score.

55.     Snapchat also incorporates various filters and add-ons, which again serve no practical purpose, but are addictive to teens and children and incentivize engagement and, at times, dangerous behavior. Many of Snap's filters allow users to change their appearance, for example, into cartoon animals and other images targeted at kids. When Z.W. was young, in fact, his mother would spend hours with him playing with those filters – as do many Americans who have a Snapchat account for that singular purpose: the fun filters which are amusing and appealing to kids.

56.     Though some of Snap's lesser-known filters are far more dangerous. For example, Snap at one point created and distributed a Speed Filter, encouraging users to record real-life speed then overlay that speed onto a mobile photo or video. Snap discontinued this feature at some point, but only after several children had died while trying to obtain a Snapchat speed filter, and only after Snap was sued.

57.     Snapchat also and incorporates a "My Eyes Only" product, which many parents do not know about – including the Plaintiff in this case. The My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. In fact, the content self-destructs if a user attempts to access the hidden folder with the wrong code. In other words, My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. Most parents also have

no idea that this product exists, and it is not something Snap mentions or highlights when advertising its social media product.

58.    Snap's disappearing messages and "My Eyes Only" feature are also incredibly problematic products because they are designed to destroy information relating to minors, which information parents have a legal right to know about and which information would otherwise be in Snap's possession, custody, and/or control.

59.    Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing. Z.W. would check his phone excessively, often prompted by the ping or buzz of a Snapchat notification – which would draw him back into the application as it was designed to do.

60.    Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features and ones discussed above are addictive to Z.W. and are targeted to underage users like him.

61.    Snap also used an algorithm or similar technology to suggest connections, that is, Snap would send messages or show recommendations to users based on some secret formula Snap used to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators – as they did with Z.W. This feature contributes nothing to the product itself and serves no informational or communication purpose. Instead,

this product is designed to reinforce addiction and increase the odds of maintaining more users for longer. Specifically, all of these defendants have determined that they are more likely to retain users in the long term if they can connect them with other users at the outset. What this also means is that Snap is actively connecting minors to complete strangers, some of whom utilize Snap's product and disappearing product features to harm minor users, which is what happened to Z.W.

62.     Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

63.     Snap's algorithms and/or similar technologies determine the content that gets recommended and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content. Snap knows or should know that its technology is promoting and amplifying harmful content to children and teens. In Ian's case, this included drug and self-harm related content – that is the content the Snapchat product deemed reasonable and appropriate for a teenaged boy.

64.     Snapchat also offers several unique messaging and data features. As discussed above, it is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[8]

65.     This product feature serves no practical purpose – that is, maintaining Snaps would in no way impact would in no way impact the communications themselves.

---

[8] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/

COMPLAINT

66.     But also, this is a dangerous and defective product feature because it does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens, including and specifically Z.W., who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap as well, yet Snap continues to advertise its product in a manner that convinces teens and children that their photos are ephemeral.

67.     Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to minors. That is, when a user is being bullied by another Snapchat user, they do not have any way to escape that abuse since Snap has not restricted direct messaging capabilities to "friends" – as it can do, and even in a manner that applies such limitation only to accounts held by minors.

68.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its users, and consistently prioritizes its own profits regardless. Users also have reason to believe that they can obtain Snapchat rewards by posting such content.

69.     Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

70.     But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a

significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1).

71.    Snap *could* protect its minor users in a content neutral way (that is, in ways that would have no impact on actual content, only on the Snap product itself). Snap has chosen to pursue astronomical profits instead.

72.    These are just some examples of Snapchat's harmful product features.

73.    Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

74.    These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

75.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

## 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

76.     Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above

77.     Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users.

78.     The Snapchat product is used by many millions of children every day, children who have become addicted to the product a result of its design and product features, like Z.W., to the point where parents cannot remove all access to the product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**B.      TikTok Background**

79.     TikTok is known as a video-sharing app, where users can create, share, and view short video clips, and is highly integrated with its Chinese parent, ByteDance.

80.     Known in China as Douyin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Douyin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became

available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

81.     TikTok has been downloaded more than 130 times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[9]

82.     TikTok exclusively controls and operates the TikTok platform for profit, which creates advertising revenue through maximizing the amount of time users spend on the platform and their level of engagement. The greater the amount of time that young users spend on TikTok, the greater the advertising revenue TikTok earns.

83.     Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "for you" based upon the user's demographics, likes, and prior activity on the app.

84.     TikTok has designed its recommendation technologies (a/k/a algorithms) to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests. There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

85.     There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

86.     An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the

---

[9] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data

stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

87.     A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

88.     Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [10]

89.     TikTok's recommendation technologies also and often work in concert with other social media provider technologies. For example, a teen may first learn about a harmful topic through Meta's recommendation technologies on Instagram, which potential harm is then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

90.     TikTok also features and promotes various "challenges" where users film

---

[10] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

COMPLAINT

themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

91.     TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

92.     TikTok's recommendation technologies present these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

93.     These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users. And, of course, TikTok also takes care to patent various aspects of its technologies. To name only a few examples (*see* https://patents.justia.com/assignee/beijing-bytedance-network-technology-co-ltd),

**Method and device for generating ranking model**
**Patent number:** 11403303
**Abstract:** The embodiment of the present application discloses a method and a device for generating a ranking model. A specific embodiment of the method includes: acquiring a sample set, executing following training steps: for the samples in the sample set, inputting the query information, the first position document and the second position document in the sample into an initial model, respectively obtaining scores of the input documents, and determining a target value of the sample based on the obtained scores, a clicked bias of a first position and an unclicked bias of a second position, updating the initial model based on the target value of each sample; determining whether the initial model is completely trained; and in response to determining that the initial model is completely trained, determining the updated initial model as the ranking model.
**Type:** Grant
**Filed:** September 7, 2018
**Date of Patent:** August 2, 2022
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.
**Inventors:** Yang Wang, Ziniu Hu, Qu Peng, Hang Li

**Method and device for processing feature point of image**
**Patent number:** 11403835
**Abstract:** A method and a device for processing feature points of an image are provided. A specific embodiment of the method includes obtaining an image to be processed; determining weights of the feature points of the image to be processed to obtain a weight set; and according to the weights, selecting target numbered feature points as target feature points of the image to be processed. The weights include a texture weight; the texture weight and a color change scope of pixels in a target sized image region in which the feature points locate are directly proportional. The embodiment can reduce the number of feature points of the image, and further release the storage pressure of feature points regarding the image.
**Type:** Grant
**Filed:** December 10, 2018
**Date of Patent:** August 2, 2022
**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.
**Inventors:** Cheng Yang, Yi He, Lei Li

**Bidirectional optical flow based video coding and decoding**
**Patent number:** 11394991
**Abstract:** Devices, systems and methods for sample refinement and filtering method for video coding are described. In an exemplary aspect, a method for video processing includes modifying, for a conversion between a block of a video and a bitstream representation of the video, a refinement value for a prediction sample in the block by applying a clipping operation to refinement value. The refinement value is derived based on a gradient value of an optical flow coding process. An output of the clipping operation is within a range. The method also includes refining the prediction sample based on the refinement value and performing the conversion based on the refined prediction sample.
**Type:** Grant
**Filed:** August 18, 2021
**Date of Patent:** July 19, 2022
**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.
**Inventors:** Hongbin Liu, Li Zhang, Kai Zhang, Jizheng Xu, Yue Wang

**Using interpolation filters for history based motion vector prediction**
**Patent number:** 11290712
**Abstract:** A method of video processing is provided to include: maintaining, prior to a conversion between a current video block of a video region and a coded representation of the video, at least one history-based motion vector prediction (HMVP) table, wherein the HMVP table includes one or more entries corresponding to motion information of one or more previously processed blocks; and performing the conversion using the at least one HMVP table; and wherein the motion information of each entry is configured to include interpolation filter information for the one or more previously processed blocks, wherein the interpolation filter information indicates interpolation filters used for interpolating prediction blocks of the one or more previously processed blocks.
**Type:** Grant
**Filed:** September 24, 2021
**Date of Patent:** March 29, 2022
**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.
**Inventors:** Hongbin Liu, Li Zhang, Kai Zhang, Jizheng Xu, Yue Wang

**Method and an apparatus for displaying information flow, a storage, an electronic device**

**Patent number:** 11334707

**Abstract:** A method and an apparatus for displaying information flow, a storage medium and an electronic device are provided. The method includes: dividing a predetermined display time period for the first-type display information into multiple sub-time periods; determining, for the sub-time periods, a segmented display target of each piece of first-type display information in the sub-period based on a display target of the first-type display information in the predetermined display time period; and determining, for each display position, target display information to be allocated to the display position from the information flow, based on an estimated click-through rate of the display position, a proposed value of the second-type display information, historical display data of the first-type display information, and a segmented display target of the first-type display information in a current sub-time period.

**Type:** Grant

**Filed:** November 14, 2018

**Date of Patent:** May 17, 2022

**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD.

**Inventors:** Shenke Xiao, Pingzhong Tang, Lihua Zhang, Xiwang Yang, Changsheng Gu

**Bi-prediction with weights in video coding and decoding**

**Patent number:** 11172196

**Abstract:** A video coding or decoding method includes using history-based motion vector prediction (HMVP) for conversion between multiple video blocks including a current block of video and a bitstream representation of the multiple video blocks such that for a uni-predicted block that for which a single reference picture is used for motion compensation, refraining from updating a look-up table for HMVP candidates for the uni-predicted block. The video coding or decoding method further includes performing the conversion using look-up tables for the multiple video blocks.

**Type:** Grant

**Filed:** October 20, 2020

**Date of Patent:** November 9, 2021

**Assignees:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO., LTD., BYTEDANCE INC.

**Inventors:** Li Zhang, Kai Zhang, Hongbin Liu, Yue Wang

**Display control method and apparatus for display interface of mobile terminal**

**Patent number:** 10908798

**Abstract:** A method and apparatus for controlling display of an interface in a mobile terminal are provided. The mobile terminal is communicatively connected to an external device. The method comprises: acquiring a pattern and/or a colour of the external device; and according to the pattern and/or the colour and the style categories of the display interface pre-stored in the mobile terminal, adjusting the current display style of the display interface, so as to enable the display style to match the pattern and/or the colour of the external device. In the display control method, the mobile terminal can adjust the display style of the display interface thereof according to the acquired pattern and/or colour of the external device, so as to enable the display style to match the pattern and/or the colour of the external device.

**Type:** Grant

**Filed:** April 25, 2014

**Date of Patent:** February 2, 2021

**Assignee:** BEIJING BYTEDANCE NETWORK TECHNOLOGY CO LTD

**Inventors:** Yonghao Luo, Zuohui Tian

94.     TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit

images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

95.    TikTok also sends push notifications and emails to encourage addictive behavior and to increase use of their TikTok product and sent such notices Z.W. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok and view the content TikTok selected, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

96.    TikTok markets itself as a family friendly social media application, and markets to children and teens.

97.    TikTok exclusively controls and operates the TikTok platform for profit, which like YouTube and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms.

98.    Based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[11]

99.    TikTok does not rely on users' self-reported age to categorize them and knows when it has underage users engaged in harmful activities on its platform. TikTok has algorithms through which is creates estimated or approximate age for its users, including

---

[11] *Id.*

COMPLAINT

facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty.

100. Like Meta and Snap, TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

101. TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

102. TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

103. TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

104. TikTok knows that it is harming teens yet consistently opts for prioritization of profit over health and well-being of its teen users.

105. The TikTok product is used by many millions of children every day, children

who have become addicted to the product a result of its design and product features, like Z.W., to the point where parents cannot remove all access to the TikTok product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**C.     Defendants' Social Media Products are Products**

106.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such.

107.    These products are designed to be used by minors and are actively marketed to teens and tweens across the United States, and were marketed to Z.W.

108.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users.

109.    Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. Defendants design their social media products in a manner intended to allow and not prevent such use, including failure to verify age and identification and allowing and encouraging multiple accounts.

110.    Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**D.     Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That Their Products Are Addictive**

111.    Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties

112.    The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

113.    Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

114.    This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

115.    According to industry insiders, YouTube, Snap, and TikTok have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

116.    YouTube, Snap, and TikTok do not warn users of the addictive design of their product. On the contrary, YouTube, Snap, and TikTok actively conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

117.    YouTube, Snap, and TikTok have repeatedly represented to the public and governments around the world that their products are safe and not addictive. Even now, YouTube represents that it enforces its "Community Guidelines using a combination of human reviewers and machine learning," and that its policies "aim to make YouTube a safer community …"

## Overview

YouTube has always had a set of Community Guidelines that outline what type of content isn't allowed on YouTube. These policies apply to all types of content on our platform, including videos, comments, links, and thumbnails. Our Community Guidelines are a key part of our broader suite of policies and are regularly updated in consultation with outside experts and YouTube creators to keep pace with emerging challenges.

We enforce these Community Guidelines using a combination of human reviewers and machine learning, and apply them to everyone equally—regardless of the subject or the creator's background, political viewpoint, position, or affiliation.

Our policies aim to make YouTube a safer community while still giving creators the freedom to share a broad range of experiences and perspectives.

TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity,"[12] and Snap's Terms of Service claim "We try hard to keep our Services a safe place for all users."[13]

118.    Again, the amount of revenue Defendants receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, YouTube, Snap, and TikTok opted for user engagement over the truth and user safety.

119.    YouTube, Snap, and TikTok's social media products are built around a series of design features that do not add to the communication and communication utility of the

---

[12] https://www.tiktok.com/community-guidelines?lang=en
[13] *See* Snap, Inc. Terms of Service, ¶ 9.

COMPLAINT

applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies" and "charms" as well as YouTube's design layout and showcasing of multiple recommended videos at one time. These designs are unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

120.    YouTube, Snap, and TikTok know that their products are addictive, and that millions of teen users want to stop using them but cannot.

121.    YouTube, Snap, and TikTok engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

122.    YouTube, Snap, and TikTok spend billions of dollars marketing their products to minors, and have deliberately traded in user harm for the sake of their already astronomical revenue stream

**E.    Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models are Based on Maximizing User Screen Time**

123.    YouTube, Snap, and TikTok have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to four of the largest technology companies in the world.

124.    YouTube, Snap, and TikTok's algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. YouTube, Snap, and TikTok's algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

125.    YouTube, Snap, and TikTok designed and have progressively modified their

products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

126.    One of these features is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants know that algorithm-controlled feeds promote unlimited "scrolling"—a type of use identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

127.    YouTube, Snap, and TikTok's algorithm-controlled product features are designed to promote content most likely to increase user engagement, which often means content that Defendants know to be harmful to their users. This is content that users would otherwise never see but for Defendant's sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

128.    The addictive nature of YouTube, Snap, and TikTok's products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

129.    YouTube, Snap, and TikTok go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

130.    YouTube, Snap, and TikTok also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

131.    YouTube, Snap, and TikTok's algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and

destructive to maximize the user's screen time.

132.    YouTube, Snap, and TikTok's algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. YouTube, Snap, and TikTok's algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the user and include private information about the user that YouTube, Snap, and TikTok discover through undisclosed surveillance of behavior online.

133.    These addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when YouTube, Snap, and TikTok have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**F.      Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

134.    The human brain is still developing during adolescence in ways consistent

with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

135.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

136.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

137.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

138.    The algorithms in YouTube, Snap, and TikTok's social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that

because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

**G.   Defendants Misrepresent the Addictive Design of Their Social Media Products**

139.   During the relevant time period, YouTube, Snap, and TikTok stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

140.   During the relevant time period, YouTube, Snap, and TikTok advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

141.   Neither YouTube, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H.   Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

142.   Plaintiffs seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and

actions, not as the speaker or publisher of third-party content.

143.    Defendants' have designed their products to be addictive. For example, Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants Snap and TikTok even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product. YouTube, Snap, and TikTok's products are designed to and do addict users on a content neutral basis.

144.    The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second— which is particularly dangerous in the case of teens.

145.    On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

146.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

147.    Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Defendants,

    a.  Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

b.  Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

c.  Know when teens and children are opening multiple accounts and when they are accessing their products excessively and in the middle of the night.

d.  Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

e.  Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features, approving product programming that promotes harmful content over clear dangers to user safety, and ignoring the disparate impact its products have on protected classes as a direct result of algorithmic discrimination perpetrated by Defendants' algorithms.

148.    While it may be a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

149.    Z.W. and children like him do not open social media accounts in the hopes of become addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Defendants' products, losing control, becoming irritable and depressed when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Defendants' minor users and resulted in serious harm to Z.W.

150.    Z.W. and children like him do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of YouTube,

Snapchat, and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, and self-harm— harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused these harms to Z.W.

151.   The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

152.   Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

153.   Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

154.    Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a couple of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and Plaintiffs anticipate finding the same types of evidence in discovery with YouTube, TikTok, and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperative regarding disclosure of their product designs and operations. In this manner too these defendants have actively concealed such harms.

155.    Defendants also approve ads that contain harmful content and utilize private information of their minor users to precisely target them with content and recommendations, assessing what will provoke a reaction, including encouragement of destructive and dangerous behaviors. Again, YouTube, Snap, and TikTok specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and to increase user engagement, resulting in more profits down the road.

156.    None of Plaintiffs' claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to objectionable content.

157.    Plaintiffs are not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

158.    None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples

include,

    a.  Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

    b.  Not permitting any targeted advertisements to any user under the age of 18.

    c.  Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

    d.  Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap and Tiktok currently claim to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account.

    e.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

    f.  Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

    g.  Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

    h.  Removing social comparison features and/or hiding those features to reduce

their harmful impact on teen users.

    i.   Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

    j.   Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

    k.   Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct communication with any user under the age of 18 not already on the other user's friend list.

159. These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue

## VI.    PLAINTIFF SPECIFIC ALLEGATIONS

### A.    Plaintiff Z.W.'s Harms Were Proximately Caused by YouTube, Snap, and TikTok's Inherently Dangerous Social Media Products

160. Z.W. is currently fifteen years old.

161. He was born in Michigan, then moved around a bit due to his father's service in the United States Marines. His family moved to California, then North Carolina, then back to Michigan in 2014.

162. Z.W. was very independent as a child, though his parents noticed early on that he struggled with motor skills and exhibited other signs of autism. They confirmed this suspicion in October of 2011. Nonetheless, Z.W. was a happy child, always smiling and looking on the bright side.

163.    When Z.W. was younger, he enjoyed video games. His favorites were The Legend of Zelda and Super Mario Bros. Sometimes he would get stuck in a game and then found out he could go to YouTube and find tutorials. On information and belief, this is what first led Z.W. to use YouTube – figuring out how to beat video games like The Legend of Zelda and Super Mario Bros. Those are the videos he searched for on YouTube.

164.    But then Z.W. began using YouTube more and more and playing videos games less and less. YouTube presented him with multiple video recommendations and options at one time, and its algorithm began pushing escalating content, which it determined might be of interest to a 9-year-old boy like Z.W. The design of the YouTube product was intended to addict young users like Z.W. and it did.

165.    Within a year, Z.W. was watching YouTube several hours every day.  He also quickly learned that he could access YouTube from essentially any device connected to Wi-Fi, and that he did not need his parents' permission to obtain such access. YouTube freely provided it, and Z.W. began watching on any device he could find. Z.W. spent increasing amounts of time watching YouTube videos, the majority of which were videos YouTube selected and/or recommended for him, and he became addicted to the YouTube product.

166.    Occasionally Z.W.'s parents would try to limit or reduce Z.W.'s access to YouTube. Because of K.A.'s addiction to YouTube, however, these efforts at exercising parental rights and authority caused severe reactions by Z.W.  Without access to YouTube he would shut down, sit in his room, and do nothing until access was restored.

167.    Moreover, the YouTube product began targeting Z.W. with inappropriate content, buried sometimes in what appeared to be children's cartoons. This included lewd, violent, and similarly inappropriate content. After witnessing one such video, Z.W.'s parents began restricting the types of shows he was allowed to search for on YouTube; but protecting him from harmful content was impossible because, unbeknownst to them, content searches were not driving Z.W.'s access to harmful content – it was YouTube's algorithms recommending content unrelated to any search and escalating content based on YouTube's programming and prioritization of engagement.

168.    At some point, Z.W.'s mother got Snapchat on her own phone as it appeared to be a fun, photo application with silly filters. She would sometimes open the Snapchat product so that she and Z.W. could take funny photos of themselves with the filters, which Z.W. loved to do. Z.W.'s mother was not aware of Snapchat product features such as Streaks and Trophies (or Charms) and understood that strangers could not find or contact you on Snapchat but that it was an application where you needed to know who the other Snapchat user was and get accepted by them to communication directly. She used the app primarily for the entertainment of taking funny photos with her son.

169.    Eventually Z.W. began begging his parents for a cell phone. He said all his friends had one, and he was beginning to feel like an outcast for not having one. His parents were reluctant and said no for many years. Then, when Z.W. was 15, they were about to go on a vacation and wanted him to be able to keep in contact with them as needed. He was also getting older, and they agreed that he could get his first cell phone.

170.    Z.W. got his first (and only) cell phone around late December 2021, when he was 15 years old. His parents discussed applications with him and told him that he could not get accounts on Facebook, Instagram, or Twitter. He asked if he could have Snapchat, because all his friends had it and because he really enjoyed playing with the photo filters.

171.    Z.W.'s parents were familiar with the Snapchat application from when they used it to take funny photos with Z.W. Its icon was a bright yellow square with a ghost, and they understood from this, as well as Snap's marketing and/or commercials, that the product was designed with kids in mind. They understood that the only things Snap was used for was taking and sending photos with silly filters, that would quickly disappear, and talking with friends – people you already knew.  Because of this, Z.W.'s parents agreed, but told him that he could not get Snapchat Premium, just the basic fun, photo app.

172.    Z.W. downloaded Snapchat immediately, and quickly became addicted. Z.W. also at some point downloaded the TikTok application, though his parents were not aware of and did not consent at the time it was put onto his phone. Because TikTok does not verify age, identity, or parental consent, however, Z.W. was able to obtain access to TikTok

COMPLAINT

regardless, and soon began recording his own TikTok videos. Z.W. quickly became addicted to the TikTok social media product as well.

173.    Like with YouTube, Z.W.'s parents would occasionally try to limit or reduce his access to social media, now the Snapchat and TikTok products. However, because of his dependency (which was foreseeable and even intended by these defendants), efforts at exercising parental rights and authority caused severe reactions, including depression and anxiety.

174.    On information and belief, Z.W. also started staying up at night or got up after his parents were asleep to access Snapchat and TikTok. He also occasionally accessed YouTube, but as his addiction to Snapchat and TikTok grew, he began watching less of that.

175.    Things began changing very soon after Z.W. got his first cell phone, when he was 15. He became withdrawn and absorbed completely in his phone, to the point where he did not ever want to put it down. He also began struggling emotionally, with anxiety and depression. His dependency on the social media products to which he now had access via his cell phone device resulted in sleep deprivation, anxiety, and other mental health harms the world is only just now learning about, but which Defendants Snap and TikTok knew or should have known to be harms caused by their social media products and, specifically, because of the way they designed those products.

176.    Z.W. became quickly addicted to specific Snapchat product features as well.

177.    Snapchat's hidden rewards operate like a slot machine, particularly when it comes to teen and child users. When minors use design features such as "streaks," "trophies," "charms," and "scores" it causes their brains to release dopamine, which creates short term euphoria. Defendants' features then exploit young users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. For example, Snapchat and TikTok send push notifications and recommendations, designed to keep users hooked. And in Snap's case, it offers rewards that require users to spend time on its product every day, without exception, and rewards that incentivize users to engage in extreme and extensive use – essentially, you never know what reward you can get until you try everything.

This is compelling, particularly to teen and child users like Z.W.

178.    Z.W. became addicted to Snap's Streaks feature, with his longest streak being 32 days – which means that he Snapped back and forth with another specific Snapchat users for 32 days without missing a single day.

179.    Z.W. became addicted to Snap's Charms and Score features as well. For example, he got a "best friend" charm for talking to a specific "friend" for a couple days in a row, which motivated him to Snap as many of his friends as often as he could, in the hopes of getting more Snapchat rewards, which rewards equal social recognition to Snapchat's teen users. Likewise, his last Snapchat score was over 10,000. He did not know precisely what actions brought up his score or how, other than that he needed to use Snap as often as possible to raise it – which is then what he tried to do.

180.    Z.W. liked Snapchat because of its funny filters, and because the Snapchat product promises a lot of friends which is something Z.W. sometimes had difficulty making in real life because of his autism. Only Snap's product was designed to addict users like Z.W. and, as he became more addicted, he became more anxious and more depressed.

181.    Snap's product is also designed to increase engagement, including by making recommendations to users as to other users they might want to add. This feature is referred to as "Quick Add." Snap's product is also designed to increase engagement by allowing users to communicate directly with other users, even if they have not been accepted as "friends" by those other users and even if those other users are minors. Both features are dangerous and defective, and cause harm to millions of minor Snapchat users every day and caused harm to Z.W. in a foreseeable manner known to these Defendants.

182.    Shortly after opening his Snapchat account, Snap recommended, connected him with, and exposed him to harmful and damaging users and content.

183.    The Snap product recommended users to Z.W., which users were not his friends and, in many cases, attempted to exploit, bully, or abuse Z.W., causing emotional distress and mental harm. In one instance, one of these Snap users pretended to be a female teen romantically interested in Z.W. The user sent him sexual texts and photos and asked

him to send her photos of his genitals. At first, Z.W. said no. The other user continued to pressure him and Z.W. believed that Snap's product would make the photo disappear, so he took and sent a Snap of himself nude.  The mysterious user was not who they purported to be. Instead, Z.W.'s photo was widely circulated on social media.

184.    On information and belief, these types of photos often are then sold and/or distributed for compensation. Z.W. was only 15 when this photo was obtained by fraud and circulated via Snapchat without his consent.

185.    Z.W. also then was bullied by a Snapchat user at his school, which user was able to bully him relentlessly on Snapchat *because* of the addiction Snapchat fostered (K.W. could not stop using Snapchat even when it was causing harm to him) and *because* of Snapchat's messaging features and settings as applied to minor users' accounts (K.W. could not escape the harassment as this person could message him despite not being on his friends list and, even if blocked, it is simple enough to open a new account).

186.    These types of direct message settings are common in social media products such as Defendants' and they are known to be harmful, particularly to teens.

187.    Z.W.'s bully went so far as to take photos of him in class, which she then sent and circulated via Snapchat. She was relentless, telling him to kill himself repeatedly and harassing him all hours of the day. The bullying ultimately led to her suspension from school, as well as his own when he finally tried to stand up for himself and responded to her in kind.

188.    Snapchat also did not verify identification or parental consent, thereby depriving Z.W.'s parents of their parental right to deny consent and protect their son from Snapchat's harmful social media product. When these issues became known to Z.W.'s parents, they withdrew consent for Z.W.'s use of Snapchat and tried to stop him from accessing the product, including by deleting it from his cell phone. On several occasions, however, Z.W. simply downloaded Snapchat again and Snap provided him with access to those accounts. Z.W.'s parents do not know many times Z.W. put the Snapchat product back on his phone, just that there was nothing they could do to stop him from obtaining access or to stop Snapchat from providing access – short of taking his phone away permanently. This

is what they told him they would do if they found Snapchat on the device again. While they have not yet found Snapchat back on the device, they have no way to know for certain whether Z.W. has kept it off the device and/or whether he has accessed Snapchat through other means.

189.    YouTube, Snap, and TikTok's failure to verify age, identification, and parental consent is a dangerous and known product defect, and one that Defendants could fix quickly and at low to no cost – the only "cost" of course being that minor users would no longer be able to access their products without parental knowledge or consent. On information and belief, this is the primary reason why Defendants have failed to make the necessary product change, despite actual knowledge that children under the age of 13 are using their products, that children under the age of 18 are using their products without parental consent, and that children are opening multiple accounts to, at least in some instance, evade parental protection and consent. These are necessary changes which Defendants should be ordered to make, as they would protect millions of minor users from the types of harms suffered by Z.W.

190.    Snap's Terms of Service claim to restrict use to minors under 18 to those who have parental consent but, again, Snap purposefully does not verify age or parental consent. Snap could reasonably and cost-effectively verify age and parental consent but does not because it knows that this would impact its revenue.

191.    Throughout these incidents, Z.W. could not stop checking his Snapchat account no matter how much it was hurting him and because of his addiction – the addiction Snap itself engineered and designed its product to promote.

192.    A few months ago, Z.W.'s parents learned from a school counselor that Z.W. confided that he was considering self-harm. Z.W.'s parents now have Z.W. on a waiting list for counseling and are working hard to get him the help he needs for his social media addiction, anxiety, depression, and other mental health harms caused by Snap's dangerous and inherently defective social media product. Z.W.'s parents, however, like many Americans do not have unlimited resources and many of the harms caused by Defendants'

COMPLAINT

products – including addiction to those products – will require far more medical attention than what is likely to be covered by E.W.'s VA administered insurance plan.

193. At one point, Z.W.'s Anxiety and depression got to the point where he began shutting down entirely and had difficulty functioning in basic and routine ways. At the same time, his addiction to the YouTube, Snap, and TikTok products is such that his parents cannot take away access without risking more serious harm to Z.W. Z.W.'s parents cannot take the phone away completely without the risk of self-harm due to severity of social media addiction caused by YouTube, Snap, and TikTok.

194. Each of these products has caused harmful addiction in Z.W., while the Snap product has caused additional mental and physical harms.

195. But for YouTube's, Snap, and TikTok's addictive-design features, which are intended to addict young users like Z.W. and which were not known to Plaintiff, his parents, or the public until September of 2021, Z.W. would not have experienced the clinical addition (and resulting harms) these features were designed to promote.

196. But for Snapchat's failure to verify parental consent for users under the age of 18, Z.W. would not have been repeatedly exposed to Snap's dangerous, defective, and addictive features and designs after the point when Z.W.'s parents withdrew consent and attempted to delete the product from the cell phone device owned by them.

197. But for Snapchat's recommendation systems, direct messaging settings (as applied to the accounts of minor users), and disappearing message feature, Z.W. would not have been bullied, exploited, abused, publicly humiliated, and otherwise harmed by persons to whom Snapchat introduced and provided access to Z.W.

198. Defendants have specifically designed their products to allow minors to use, become addicted to, and abuse their products without consent of parents.

199. Defendants have specifically designed their products to be appealing to minors but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minors, like Z.W., that such products have because of their objectives and design.

200.    Neither Z.W. nor his parents were aware of the clinically addictive and harmful effects of these products when Z.W. began to use them.

201.    Defendants not only failed to warn Z.W. and his parents of the dangers of addiction, sleep deprivation, problematic use, harmful social comparison features and risk of exploitation and abuse due to product features and settings, but misrepresented the safety, utility, and non-addictive properties of their products.

202.    As a result of Z.W.'s extensive and problematic use of the YouTube, Snap, and TikTok social media products, he has developed numerous mental health conditions that he is likely to struggle with for the rest of his life. This includes but is not limited to his ongoing addiction to these products, which is severe to the point of causing physical discomfort when Z.W. does not have access and will likely require professional treatment. As well as anxiety and depression, and the traumatic and publicly damaging events that occurred as a result of the inherently dangerous and defective design of the Snapchat product.

## VII.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

203.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 200 as if fully stated herein.

204.    Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

205.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the

condition and its defective condition was a cause of Plaintiffs' injury.

206.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

207.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

**A.    Inadequate Safeguards From Harmful and Exploitative Content**

208.    YouTube, Snapchat, and TikTok are defectively designed.

209.    As designed, YouTube, Snapchat, and TikTok algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

210.    As designed, YouTube, Snapchat, and TikTok algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies

that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide – all of which are at issue in this case.

211.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens Z.W.; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

212.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

213.    YouTube, Snapchat, and TikTok are defectively designed.

214.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

215.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and

trafficking, and commercial sex acts.

216.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

217.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

218.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

219.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.    Inadequate Parental Control and Monitoring**

220.    YouTube, Snapchat, and TikTok are defectively designed.

221.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

222.    It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

223.   Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

224.   Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.      Intentional Direction of Minor Users to Harmful and Exploitative Content**

225.   YouTube, Snapchat, and TikTok are defectively designed.

226.   Default "recommendations" communicated to new teenage users, including Z.W., purposefully steer them toward content Defendants knew to be harmful to children of their age and gender.

227.   Ad content pushed to new minor users, including Z.W., because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.      Inadequate Protection of Minors from Sexual Exploitation and Abuse**

228.   YouTube, Snapchat, and TikTok are defectively designed.

229.   Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

230.   Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

231.   Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

232.   Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the

purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.    Design of Addictive Social Media Products**

233.    YouTube, Snapchat, and TikTok are defectively designed.

234.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

235.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

236.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the

58

activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

237.   Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

238.   The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BSMAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

239.   BSMAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

240.   You spend a lot of time thinking about social media or planning how to use it.

241.   You feel an urge to use social media more and more.

242.   You use social media in order to forget about personal problems.

243.   You have tried to cut down on the use of social media without success.

244. You become restless or troubled if you are prohibited from using social media.

245. You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

246. Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

247. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

    a. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

    b. Tolerance, the need to spend more time using social media to satisfy the urge.

    c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e. Continuing to use social media despite problems.

    f. Deceiving family members or others about the amount of time spent on social media.

    g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h. Jeopardized school or work performance or relationships due to social media usage.

248.   Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

249.   It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**G.   Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

250.   YouTube, Snapchat, and TikTok are defectively designed.

251.   Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

252.   It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

253.   Defendants' products are not reasonably safe as designed because, despite

numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

254.   Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

255.   Moreover, it is reasonable for parents to expect that platforms such as YouTube, Snapchat, and TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

256.   As a proximate result of these dangerous and defective design attributes of Defendants' product, Z.W. suffered and is continuing to suffer mental harm. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until late 2021.

257.   As a result of these dangerous and defective design attributes of Defendants' products, Z.W. has suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from her social media addiction.

258.   Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of YouTube, Snapchat, and TikTok.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

259.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 256 as if fully stated herein.

260.   Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been

reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

261.    Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of YouTube, Snapchat, and TikTok.

262.    Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

263.    The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

264.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

265.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

266.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of

communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

267.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

268.    As a result of Defendants' failure to warn, Z.W. suffered and continues to suffer severe mental harm from his use of YouTube, Snapchat, and TikTok.

269.    As a result of Defendants' failure to warn, Z.W.'s parents have also suffered emotional distress and pecuniary hardship due to their child's mental and physical harm resulting from social media addiction.

270.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of YouTube, Snapchat, and TikTok.

**COUNT III – NEGLIGENCE**

271.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 268 as if fully stated herein.

272.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Z.W.

273.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

274.    As product manufacturers marketing and selling products to consumers,

Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

275.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

276.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Z.W., using their social media products.

277.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

278.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

279.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

280.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

281.    As a result of Defendants' negligence, Z.W. suffered and continues to suffer severe mental harm from his use of YouTube, Snapchat, and TikTok.

282.    As a result of Defendants' negligence, Z.W.'s parents have suffered emotional distress and pecuniary hardship due to their child's mental and physical harm resulting from social media addiction.

283.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Z.W., whom they knew would be seriously harmed through the use of their social media products.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

1.  Past physical and mental pain and suffering of Z.W., in an amount to be more readily ascertained at the time and place set for trial.

2.  Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial.

3.  Past and future medical care expenses for the care and treatment of the injuries sustained by Z.W., in an amount to be more readily ascertained at the time and place set for trial.

4.  Past and future impairment to capacity to perform everyday activities.

5.  Past and future medical expenses of Z.W.

6.  Past physical and mental pain and suffering of E.W. in an amount to be more readily ascertained at the time and place set for trial.

7.  Monetary damages suffered by E.W.

8.  Punitive damages.

9.  For the reasonable costs and attorney and expert/consultant fees incurred in this action.

10. For injunctive relief prohibiting of each of the following,

    a.    Distribution to any user without a verified email address.

    b.    Distribution to any user without a verified phone number.

    c.    Distribution to any user without proof of identity or, in the case of users

under the age of 18, proof of consent by a parent or guardian.

d.    Distribution to any user under the age of 18 without also obtaining a verified email address and phone number for the user's parent or guardian.

e.    Distribution to any user under the age of 18 where a parent or guardian has provided written (including email) notice that their child does not have permission to use Defendants' social media product (also requiring Defendant to provide a physical and email address where notices can be sent).

f.    For users under the age of 18, distribution of any social media product for more than two hours in a 24-hour period.

g.    For users under the age of 18, distribution of any social media product during the hours of 11 p.m. and 6 a.m., utilizing the time zone where the minor user is reasonably believed to be located and/or the time zone applicable at the time the account was opened.

h.    For users under the age of 16, distribution of any social media product during any times of day not approved by the minor user's parent or guardian.

i.    For users under the age of 16, access to any "group" that is not publicly visible (also requiring Defendant to provide separate, email notice to the parent or guardian each time the user joins a new group).

j.    Distribution to any user of more than one account.

k.    Distribution to any user over the age of 18, but who has been found to have represented or claimed on their profile, postings, or in messaging features that they are under the age of 18.

l.    Distribution to any user on the sex offender registry list.

m.    Use of algorithms and similar technologies to suggest, recommend, or provide unsolicited content to any user under the age of 18.

n.    Use of algorithms and similar technologies to rank or order any content

shown to any user under the age of 18 except via objective and transparent methods, for example, ranking in chronological order.

o.   Use of visible "likes" and similar reaction and social comparison features.

p.   Use of any feature that requires users to log onto the product at specific days, times, or durations to maintain any form of status, standing, or rewards, including but not limited to the Snap Streak feature.

q.   Use of any feature that promises or offers hidden rewards, i.e. rewards where the identity or nature of the reward is not known ahead of time, like Trophies.

r.   Use of avatars, emojis, cartoons, or any other aesthetic feature that foreseeably targets or appeals to minors.

s.   Conditioning use of any game provided on opening of a social media account.

t.   Targeting of advertisements based on gender and/or protected class status.

u.   Targeting of any content whatsoever based on protected class status.

v.   Distribution of any product that is suspected to or does operate with any degree of algorithmic discrimination where such discrimination would foreseeably impact any member of any protected class.

w.   Marketing to any person under the age of 18.

x.   Collection of any consumer-related data from any third party relating to any user under the age of 18.

y.   Provision of any consumer-related data to any third party relating to any user under the age of 18.

z.   Collection of any data about any user under the age of 18 from any source, except for information provided at account opening, account activities and communications, and other data reasonably necessary to operate the social media product.

aa.   Approval, distribution, and/or creation or encouragement of harmful

advertising content, including but not limited to content that encourages drug use or eating disorders.

bb. For users under the age of 18, any setting that makes the account public or in any way visible to any person not specifically "connected" to the user.

cc. For users under the age of 18, any setting or tool through which communication is allowed with any person not already "connected" to the minor user. This includes but is not limited to thinks like Messenger, Direct Messaging, Snaps, and similar direct communication features.

dd. For users under the age of 16, any feature of setting that allows them to a "connect" with any other user absent parental consent and confirmation of parental consent to the "connection."

ee. Use of any friend, connection, or follow recommendation tool in connection with any user under the age of 18, which means not making recommendations to the minor user and not making recommendations about the minor user.

ff. Use of any group, page, or subject matter recommendation tool in connection with any user under the age of 18, which means not making recommendations to the minor user and not making recommendations about the minor user.

gg. Use of any disappearing, expiring, or automatic deletion features on any communications or communication content sent to or received by any user under the age of 18.

hh. Use of any feature that allows any user under the age of 18 to restrict access to content or otherwise conceal content from others, for example, the Snapchat My Eyes Only Feature

ii. Use of any feature that tracks and/or shares the location of any user under the age of 18.

jj.   Use of any feature that allows any user under the age of 16 to send or receive money or any cash equivalent.

kk.   Deletion of any identification or user information collected about any user under the age of 18 (and requiring provision of all such within three (3) business days of any written request by parent or guardian).

ll.   Deletion of any identification of any account activity data for any account held by any user under the age of 18 (and requiring provision of all such within five (5) business days of any written request by parent or guardian).

mm.   Deletion of any communications sent or received by any user under the age of 18, including the communication as well as any content included in or linked to the communication (and requiring provision of all such communications within three (3) business days of any written request by parent or guardian).

nn.   Use of any push notifications or reminders or other notifications relating to activity taking place on social media.

oo.   Use of any workflows that discourage any user from closing their account.

pp.   Sending of any communication to any user under the age of 18 that is not also sent to that user's parent or guardian.

11. For such other and further relief as this Court deems just and equitable.

Dated: August 5, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____
    Laura Marquez-Garrett, SBN 221542

Laura Marquez-Garrett
laura@socialmediavictims.org
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Matthew Bergman
matt@socialmediavictims.org

70

COMPLAINT

Glenn Draper
glenn@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiff

COMPLAINT